*Darryl Edward Freeman v. State of Maryland*, No. 24, September Term, 2023.  Opinion by Hotten, J.

**EVIDENCE – MARYLAND RULES 5-701 AND 5-702 – DISTINGUISHING BETWEEN LAY AND EXPERT TESTIMONY**

The Supreme Court of Maryland held that testimony by a police officer who opined regarding the definition of the slang term "lick" did not fall under Maryland Rule 5-702. *Ragland v. State* and its progeny instruct that a witness must be qualified as an expert under Maryland Rule 5-702 when their testimony is beyond the "ken" of a layperson.  385 Md. 706, 870 A.2d 609 (2005).  Opining to the colloquial definition of the slang term "lick" or "sweet licks" is not beyond the "ken" of a layperson.  *Compare State v. Blackwell*, 408 Md. 677, 681, 971 A.2d 296, 298 (2009) (holding that testimony concerning a scientific test fell under Maryland Rule 5-702), *with State v. Galicia*, 479 Md. 341, 392–94, 278 A.3d 131, 160–61 (2022) (holding that testimony on "Google's location history tracking" service was within the "ken" of a layperson given the prevalence of cell phones in society).

IN THE SUPREME COURT

OF MARYLAND

No. 24

September Term, 2023

_____

DARRYL EDWARD FREEMAN

v.

STATE OF MARYLAND

_____

Fader, C.J.,
Watts,
*Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

_____

Opinion by Hotten, J.
Watts, J., dissents.

_____

Filed: July 16, 2024

*Hotten, J., now a Senior Justice, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to Maryland Constitution, Article IV, § 3A, she also participated in the decision and adoption of the majority opinion.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

Petitioner, Darryl Edward Freeman, was charged in the Circuit Court for Charles County with fourteen counts[1] surrounding the killing of Mr. Bradley Brown. During the direct examination of Detective Corey Wimberly ("Det. Wimberly") at trial, the State sought to elicit an opinion regarding the meaning of the slang terms "lick" and "sweet licks." Petitioner objected, arguing that Det. Wimberly had not been offered as an expert relative to defining those terms. The circuit court overruled Petitioner's objection and allowed Det. Wimberly to testify that "lick" meant a robbery and "sweet lick" meant "an individual [who] is . . . easy to rob."[2]

Petitioner was convicted on all counts, nine of which were later merged with related counts for purposes of sentencing. Petitioner appealed to the Appellate Court of Maryland, which affirmed. *Freeman v. State*, 259 Md. App. 212, 257, 303 A.3d 62, 88 (2023). The Appellate Court held that the opinion of Det. Wimberly was expert in nature under Maryland Rule 5-702, but that the circuit court "implicitly" accepted Det. Wimberly as an expert witness in overruling Petitioner's objection. *Id.* at 235–36, 303 A.3d at 75–76.

---

[1] Petitioner was charged with murder in the first-degree under the theories of premeditation and felony murder, assault in the first-degree, armed robbery, three counts of use of a firearm in the commission of a crime of violence, robbery, theft, possession of a firearm by a person under the age of twenty-one, transport of a handgun on public roads, and four counts of conspiracy to commit assault and robbery.

[2] Aside from relevant excerpts from the transcripts, we will refer to the term "lick" as including "lick" and "sweet licks" for convenience. Both terms were defined at the same time and asserted to have similar definitions.

We granted *certiorari* on six questions, which we rephrase[3] into one for the sake of clarity: In the instant case, did the circuit court properly permit Det. Wimberly to opine that the word "lick" means "a robbery," either as an expert or as a lay witness? We hold that the circuit court properly permitted Det. Wimberly to opine regarding the definition of "lick" in his capacity as a lay witness.

---

[3] Petitioner presented four questions:

1. Where a witness is not disclosed in discovery or offered at trial as an expert, does Maryland law recognize a theory that such a witness may "implicitly" be found to be an expert and therefore provide opinion testimony?

2. Assuming that such an implicit finding is valid, by what means does an opposing party determine the field or area of the witness's alleged expertise?

3. In the instant case, was [Det.] Wimberly, who was not disclosed or offered as an expert, properly permitted to testify that in his opinion, the words "lick" and "sweet licks," referred to in text messages between [Petitioner] and his alleged co-conspirators, meant "robbery" and "robbery of an easy target," respectively?

4. Regardless of whether the trial judge makes an implicit or explicit finding, does the State's noncompliance with [Maryland] Rule 4-263(d)(8) preclude the calling of an expert witness?

In its cross-petition, the State presented two additional questions:

[1.] May a lay witness testify to the meaning of a slang term with which the witness is familiar?

[2.] Did the [circuit] court in this case properly permit Det[. Wimberly] to give lay opinion testimony that the word "lick" means "a robbery"?

## FACTUAL AND PROCEDURAL BACKGROUND

### Factual Background

Both Petitioner and the State adopt the facts as outlined by the Appellate Court. We shall do the same. According to the Appellate Court:

At around 7:00 p.m. on February 18, 2020, first responders arrived at 3117 Warehouse Landing Road, Bryans Road, Maryland, and found [Mr.] Bradley Brown lying on the driveway, outside near the garage. As would be later determined, [Mr.] Brown sustained two fatal gunshot wounds, one to the chest and the other to his right thigh, and the manner of his death was determined to be a homicide.

In brief, the police recovered the victim's cellphone at the crime scene and found information therein that led them to suspect [Petitioner]. Through text messages on the victim's and [Petitioner]'s cellphones, the police learned that the victim, [Mr.] Brown, was selling illegal THC vape pens through social media. At around the same time, and prior to the murder, [Petitioner] was texting his co[-]conspirators and others, and those conversations concerned [Petitioner]'s attempts to obtain handguns and to commit a robbery.

On the night of the murder, [Petitioner] was in the company of some of his co[-]conspirators. He was also communicating via Snapchat[4] with the eventual victim, [Mr.] Brown, less than an hour before the murder. It was the State's theory that [Petitioner] and [Mr.] Brown were discussing an anticipated sale of some of the THC vape pens. Through eyewitness testimony, corroborated by surveillance video, neighbors recounted that they saw a vehicle park in [Mr.] Brown's driveway shortly before two gunshots were heard. The evidence at the scene included a loaded, but unfired[,] firearm near the victim's feet, and THC vape pens in the open trunk of the victim's car, parked inside the garage. Cellphone location evidence and DNA evidence from a hairbrush found nearby on the ground placed [Petitioner] at the scene.

---

[4] "Snapchat" is "the name of a social media service for sending pictures, messages, and videos that are only available to be seen for a limited amount of time[.]" *Snapchat*, CAMBRIDGE DICTIONARY, *archived at* https://perma.cc/W5HD-VBN9.

> Later that same evening, [Petitioner]'s alleged co[-]conspirators were in possession of THC vape pens, and the State's theory was that these were the same ones stolen during the robbery and murder.

*Id.* at 221–23, 303 A.3d at 67–68 (footnotes omitted).

### Petitioner's Trial

Trial was held between April 26 and May 6, 2021 in the Circuit Court for Charles County. The State called Det. Wimberly to testify regarding his investigation.[5] During the course of examination, the State asked him to define the term "lick," based on his experience in the Robbery Unit of the Charles County Sheriff's Department. Petitioner objected, arguing the response would elicit an expert opinion. The State countered that it provided the requisite notice of the testimony pursuant to this Court's precedent in *Ragland v. State*, 385 Md. 706, 870 A.2d 609 (2005), and *State v. Blackwell*, 408 Md. 677, 971 A.2d 296 (2009).

Petitioner argued that he was entitled to "specific notice [that Det. Wimberly was] an expert in the field of criminal slang." The circuit court overruled Petitioner's objection. Thereafter, the State resumed its questioning of Det. Wimberly, eliciting that "lick" meant a robbery and "sweet lick" meant "an easy rob[ or] easy to rob." Following the examination of Det. Wimberly, the State introduced phone messages between Petitioner and a contact named "Ebony[,]" wherein Petitioner asked "[w]here the sweet licks?" Additionally, the State introduced communications between Petitioner and a contact identified as "NIY

---

[5] Relevant excerpts from the transcripts are provided below in the discussion.

4

Creations[,]" in which Petitioner asked "I [expletive] up my money on something good, but ji [sic] left me with couple hunned [sic]. You got some licks I can hit?"

At the close of trial, the jury returned a verdict of guilty on the counts of first-degree felony murder, assault in the first-degree, armed robbery, use of a firearm in the commission of a crime of violence for each of the three preceding offenses, robbery, theft, possession of a firearm by a person under the age of twenty-one, transport of a handgun on public roads, and for four conspiracies related to the assault, armed robbery, robbery, and theft offenses. For purposes of sentencing, the circuit court merged the assault, armed robbery, robbery, and theft convictions into first-degree felony murder, merged the use of a firearm convictions, and merged the conspiracy convictions. Petitioner was sentenced to life for first-degree felony murder, and a combined total of forty-eight years on the other convictions, which were to run concurrently with his life sentence. Petitioner timely appealed to the Appellate Court of Maryland. *See generally Freeman*, 259 Md. App. 212, 303 A.3d 62.

### Opinion of the Appellate Court of Maryland

In a reported decision, the Appellate Court affirmed the convictions.[6] *Id*. at 257, 303 A.3d at 88. Regarding the meaning of "lick," the Appellate Court held that Det. Wimberly's opinion was within the realm of expert opinion testimony, but the circuit court had "implicitly" qualified Det. Wimberly as an expert when it overruled Petitioner's objection. *Id.* at 234–36, 303 A.3d at 74–75.

---

[6] Although not relevant to this appeal, the Appellate Court merged another count and vacated three conspiracy convictions. *Freeman*, 259 Md. App. at 257, 303 A.3d at 88.

After reviewing nontraditional dictionaries,[7] the Appellate Court determined that "lick" may have multiple meanings, including "a successful type of theft[,]" a "sudden influx of money," and "to beat[.]" *Id.* at 233, 303 A.3d at 74 (cleaned up). The Appellate Court also pointed to *Armstead v. State*, 342 Md. 38, 56, 673 A.2d 221, 230 (1996), for the proposition that "words and phrases often have multiple meanings, and 'the meanings of even common words may be context-dependent[.]'" *Id.* at 234, 303 A.3d at 74. "Considering these principles," the Appellate Court held that "[t]he meaning attributed by [Det.] Wimberly may well have been foreign to members of the jury, and it is reasonable to conclude that this interpretation was based on his specialized knowledge, training and experience[]" thus requiring qualification of Det. Wimberly as an expert. *Id.* at 235, 303 A.3d at 75.

The Appellate Court also considered whether Det. Wimberly had been properly qualified as an expert, concluding that "although the court did not expressly accept [Det.] Wimberly as a qualified expert, he was deemed so, albeit implicitly."[8] *Id.* at 236, 303 A.3d

---

[7] The Appellate Court cited "the Urban Dictionary," a "crowdsourced online dictionary of slang words and phrases[,]" Library of Congress, *Urban Dictionary: Define Your World*, *archived at* https://perma.cc/KXG9-3BRY, and "cyberdefintions.com" which describes itself as "contain[ing] thousands of definitions, icons, emojis, and numeronyms that will help you communicate more effectively . . . across the various communications apps and social-media platforms[,]" WELCOME TO CYBER DEFINITIONS!, *archived at* https://perma.cc/WWS9-69SJ.

[8] We note that the circuit court did not so implicitly recognize Det. Wimberly. In discussing Petitioner's objection, the circuit court questioned "[i]s there such thing as an expert in slang?" The circuit court further expressed,

at 75. The Appellate Court reasoned that the circuit court was not required to "spell out every step in weighing the considerations that culminate in a ruling[]" and, for example, "use 'magic words' to find that a waiver of the right to jury trial was made 'knowingly' and 'voluntarily.'" *Id.*, 303 A.3d at 75–76 (citing *Nalls v. State*, 437 Md. 674, 689, 89 A.3d 1126, 1134 (2014)). The Appellate Court concluded that, "it is clear that the [circuit] court thought, by simply overruling [Petitioner's] objection that [Det.] Wimberly was not disclosed as an expert in slang, it was going to admit the detective's expert opinion[,]" and held that the circuit court did not abuse its discretion. *Id.* at 237, 303 A.3d at 76.

Petitioner filed a petition for a writ of *certiorari* with this Court and the State submitted a conditional cross-petition, both of which were granted. *Freeman v. State*, 486 Md. 228, 305 A.3d 859 (2023).

## DISCUSSION

### Standard of Review

> It is the general rule that the admissibility of expert testimony is within the sound discretion of the trial judge and will not be disturbed on appeal unless clearly erroneous. In this regard, the trial judge has wide latitude in determining whether expert testimony is sufficiently reliable to be admissible.

> I understand experts that come in to help juries with issues that are really beyond the pale of the lay person to understand . . . [b]ut like why something happened, or prognosis going forward, that sort of thing that would require expert testimony, does the rule require you to be an expert to come in, for example, to explain what LOL means in text message? Or licks, or, you know, WYD, or whatever?

The circuit court did not believe expertise was needed at all. As discussed below, the circuit court was correct. Consequently, Petitioner's first and second proposed questions were not properly before us and were not included in the rephrased question.

7

*Wilson v. State*, 370 Md. 191, 200, 803 A.2d 1034, 1039 (2002) (citation omitted). An abuse of discretion is found where the decision is "well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable." *Devincentz v. State*, 460 Md. 518, 550, 191 A.3d 373, 391 (2018) (citation omitted). However, "even with respect to a discretionary matter, a [circuit] court must exercise its discretion in accordance with correct legal standards. We review *de novo* a trial judge's decision involving a purely legal question." *Ehrlich v. Perez*, 394 Md. 691, 708, 908 A.2d 1220, 1230 (2006) (quotation marks and citations omitted).

**The Circuit Court Properly Allowed Det. Wimberly to Testify as a Lay Witness**

Petitioner adopts and incorporates the reasoning of the Appellate Court relative to Det. Wimberly's opinion concerning the meaning of "lick." Petitioner asserts that we drew a "sharp line" in *Ragland* requiring satisfaction of Maryland Rule 5-702[9] when an opinion "is based upon specialized knowledge, training, skill, or experience[.]" According to Petitioner, the record demonstrates an "inextricable intertwining of [Det. Wimberly]'s specialized knowledge and experience with his opinion[.]" Petitioner contends that this foundation makes "[t]his case clearly fall[] on the expert side of the *Ragland* line."

---

[9] Maryland Rule 5-702 provides that:

> Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

8

The State argues that the circuit court correctly allowed Det. Wimberly to testify as a *lay* witness. The State asserts that Maryland courts allow officers to testify as lay witnesses based on their personal knowledge. For example, the State turns to *In re Ondrel M.*, 173 Md. App. 223, 243, 918 A.2d 543, 554–55 (2007), where the Appellate Court held that an officer need not be qualified as an expert to testify, based on their experience, to their opinion that a smell was of marijuana. The State compares the present case with *In re Ondrel M.*, arguing that "[a]kin to the odor of marijuana" the detective "need only to have encountered the [term] in daily life to be able to recognize [it]."

The State also relies on *State v. Galicia*, 479 Md. 341, 278 A.3d 131 (2022), where we held that testimony regarding the function of cell phone applications was permissible lay opinion testimony since the subject was "common knowledge in modern society." The State argues that "lick," as a reference to a robbery, is so common a phrase "that it has entered the national lexicon." The State points to the Urban Dictionary, which defines "lick" as "[a] successful type of theft" and several news articles from Pennsylvania, Florida, and Texas, all within recent months, which note similar definitions. The State distinguishes *Ragland* and *Blackwell* from the present case, arguing *Ragland* held that the opinions from officers were expert in nature because the State had the officers describe their specialized knowledge of drug recognition and that *Blackwell* held the opinion was expert in nature because it related to a scientific test.

The State argues that "an individual's testimony giving a common meaning of a slang term, premised on that person's own personal knowledge and life experiences[]" is not expert testimony under Maryland Rule 5-702. The State cites *King v. United States*,

9

74 A.3d 678 (D.C. 2013), as an illustrative example, where the District of Columbia Court of Appeals held that an officer acquired knowledge of slang terms from common experiences and could testify regarding those terms as a lay witness. The State also points to *Prince v. State*, 216 Md. App. 178, 201, 85 A.3d 334, 348 (2014) to argue that Det. Wimberly's tenure as an officer does not render his opinion expert in nature.

As we will explain, we agree with the State that Det. Wimberly's opinion regarding the definition of the slang term "lick" is not expert testimony under Maryland Rule 5-702. Defining the slang term "lick" is not beyond the "ken" of a layperson and does not require expertise for admission. Accordingly, we hold the circuit court did not abuse its discretion in permitting Det. Wimberly to testify as a lay witness regarding the meaning of "lick."

"Expert testimony is required only when the subject of the inference is so particularly related to some science or profession that is beyond the ken of the average lay[person]; it is not required on matters of which the jurors would be aware by virtue of common knowledge." *Johnson v. State*, 457 Md. 513, 530, 179 A.3d 984, 994 (2018) (cleaned up). "When a court considers whether testimony is beyond the 'ken' of the average lay[person], the question is not whether the average person is already knowledgeable about a given subject, but whether it is within the range of perception and understanding." *Galicia*, 479 Md. at 394, 278 A.3d at 161.

*Ragland* and its progeny reflect the interpretation and application of Maryland Rules 5-701,[10] which concerns lay opinion testimony, and 5-702, which concerns expert

---

[10] Maryland Rule 5-701 provides:

testimony, by this Court. In *Ragland*, we addressed whether the testimony of two officers, regarding whether an observed interaction was a drug transaction, fell under Maryland Rule 5-701 or Maryland Rule 5-702. *Ragland* distinguished Maryland Rules 5-701 and 5-702 through review of their federal equivalents, Federal Rules 701 and 702. 385 Md. at 720–25, 870 A.2d at 617–20. We noted two competing interpretations regarding the scope of permissible lay testimony, and elected to follow the "more narrow" interpretation "as expressed in the amended [Federal Rule] 701."[11] *Id.* at 725, 870 A.2d at 620. Additionally, we

> agree[d] . . . that by permitting testimony based on *specialized* knowledge, education, or skill under rules similar to [Maryland] Rule 5[-]701, parties may avoid the notice and discovery requirements of our rules and blur the distinction between the two rules. Accordingly, we will follow the approach as reflected in the 2000 amendment to [Federal Rule] 701 and hold that [Maryland] Rules 5[-]701 and 5[-]702 prohibit the admission as "lay opinion" of testimony based upon *specialized* knowledge, skill, experience, training or education.

---

[i]f the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

[11] In 2005,

[a]s amended, [Federal] Rule [701] read[] as follows: "If the witness is not testifying as an expert, the witness'[s] testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness'[s] testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of [Federal] Rule 702."

*Ragland*, 385 Md. at 722, 870 A.2d at 618 (emphasis omitted).

*Id.* at 725, 870 A.2d at 620 (emphasis added) (footnote omitted). Key to our holding in *Ragland* was that neither Maryland Rules 5-701 nor 5-702 permitted "the admission as 'lay opinion' of testimony based upon specialized knowledge, skill, experience, training or education." *Id.*, 870 A.2d at 620. At issue in *Ragland* was testimony of police officers concerning their recognition of an interaction that they witnessed as being a drug transaction. We concluded that the

> testimony [could not] be described as lay opinion. These witnesses had devoted considerable time to the study of the drug trade. They offered their opinions that, among the numerous possible explanations for the events on Northwest Drive, the correct one was that a drug transaction had taken place. The connection between the officers' training and experience on the one hand, and their opinions on the other, was made explicit by the prosecutor's questioning. Such testimony should have been admitted only upon a finding that the requirements of [Maryland] Rule 5[-]702 were satisfied.

*Id.* at 726, 870 A.2d at 620–21. Thus, the testimony from the officers elucidated the lengths at which they needed to develop their skills in order to opine regarding the observed interaction.

Following *Ragland*, *Blackwell* considered whether an officer needed to be qualified as an expert to testify about his administration of the Horizontal Gaze Nystagmus ("HGN") test, a field sobriety test administered upon drunk driving suspects, in which the test administrator looks for signs of inadvertent eye movement while the subject is directed to look in different directions, was expert testimony, "emphasizing that the HGN test is a scientific test[.]" 408 Md. at 681, 971 A.2d at 298. "Applying the rule from *Ragland*[,]" and "emphasizing that the HGN test was a scientific" one, we concluded that an officer's

> testimony about [Mr.] Blackwell's performance on the HGN test constituted expert testimony subject to the strictures of Md. Rule 5-702. [The officer]

12

reported, among other things, that [Mr.] Blackwell had "lack of smooth pursuit" and "distinct nystagmus at maximum deviation" in each eye. This testimony was not based upon [the officer]'s general knowledge as a layperson but upon his specialized knowledge and training. To be sure, *the HGN test is a scientific test*, and a layperson would not necessarily know that "distinct nystagmus at maximum deviation" is an indicator of drunkenness; nor could a layperson take that measurement with any accuracy or reliability.

*Id.* at 691, 971 A.2d at 304. *Blackwell* further demonstrated that the nature of the topic informs whether the testimony requires "specialized knowledge and training[]" beyond the "ken" of a layperson. *Id.*, 971 A.2d at 304. *Blackwell* stands for the proposition that terminology derived from the application of a scientific test is beyond the "ken" of a layperson, *i.e.*, an average person would not be familiar with the test or how to apply it.

Next, in *State v. Payne*, this Court held that an officer was required to be qualified as an expert under Maryland Rule 5-702 to testify about the process he used to parse cell phone data. 440 Md. 680, 701, 104 A.3d 142, 154 (2014). There, an officer used his experience to narrow phone records from "thousands of pages" down to dozens of pages and, eventually, "to a single page document and . . . a quarter-page exhibit[]" with the information pertinent to the matter. *Id.* at 685, 104 A.3d at 145. We considered this a process "beyond the ken of an average person[]" which in turn made the officer's "conclusions regarding the communication path . . . require[] that he be qualified as an expert witness." *Id.* at 700, 104 A.3d at 154. "Against the foregoing technical background," we rejected the State's assertion "that a layperson with the same phone records and instructions could have determined the location of the cell sites[.]" *Id.* at 697, 700, 104 A.3d at 152, 154 (internal quotation marks omitted). We explained that similar

13

to *Blackwell*'s scientific test, a phone record "contains a string of data unfamiliar to a layperson and is not decipherable based on 'personal experience[.]'" *Id.* at 701, 104 A.3d at 154.

In 2018, *Johnson* explored "whether expert testimony is required before a [circuit] court may admit . . . GPS data." 457 Md. at 530, 179 A.3d at 993. We concluded that it did not, *id.* at 537, 179 A.3d at 998, reasoning that "GPS technology is pervasive and generally reliable[]" and that the "technology is also familiar to the general public," *id.* at 530–31, 179 A.3d at 994. *Johnson* distinguished *Payne*, noting that the testimony in *Payne* concerned

> cell phone records [which] were "not decipherable" based on common experience because they consisted of a "string of data." The detective had to rely on "knowledge, skill, experience, training or education" to understand the "technical language of the entries" to hone in on the pertinent entries and eliminate extraneous data.

*Id.* at 534, 179 A.3d at 996 (citations omitted). "By contrast," the testimony in *Johnson* consisted of an officer reading report entries which, given the common understanding of GPS technology, were "decipherable without specialized knowledge." *Id.* at 535, 179 A.3d at 996.

In 2022, *Galicia* distinguished testimony concerning "Google's location history tracking" from the cell phone data of that in *Payne*. 479 Md. at 394, 278 A.3d at 161. We concluded that, unlike *Payne*, testimony regarding the function of Google's service was "simple recitation" that "used no specialized skill to reformat or translate any of the raw data." *Id.* at 393, 278 A.3d at 161. Indeed, we noted that "Google's location history tracking is a consumer feature designed to be understood and managed by accountholders."

*Id.* at 394, 278 A.3d at 161. The prevalence of cell phone ownership and usage made it "common knowledge" that "a mobile electronic device allows its users to customize the data they share with the manufacturer, the cell phone service provider, and various apps[.]" *Id.*, 278 A.3d at 161.

*Ragland* and its progeny reinforce that the determinative factor between lay opinion testimony under Maryland Rule 5-701 and expert opinion testimony under Maryland Rule 5-702 is whether the topic and the foundation undergirding it lies within the "ken" of a layperson. The testimony at issue is distinguishable from what we have determined to be expert testimony as illustrated in these cases. Here, the colloquy between the State and Det. Wimberly proceeded as follows:

> [The State]: Okay. Now, you indicated that you have been in the robbery unit for nine years now?
>
> [Det. Wimberly]: Correct.
>
> [The State]: In the course of your training and experience in that particular unit, have you come across the term, "lick"?
>
> [Det. Wimberly]: Yes.
>
> [The State]: Okay, and what is lick, in your training and experience?

Following objection from Petitioner, which the circuit court overruled, the colloquy continued:

> [The State]: So anyway, [Det.] Wimberly, over the course of your nine years in the robbery unit, have you had the occasion to come across the term, lick?
>
> [Det. Wimberly]: Yes, I have.
>
> [The State]: Okay, and what, through your training and experience as law enforcement officer, again, as robbery detective, does that term mean?

15

[Det. Wimberly]: A robbery.

[The State]: Okay, and what about in the context of sweet, or something like that?

[Det. Wimberly]: Yeah, [an] individual, they might refer to it as saying lick, meaning an individual is an easy rob, easy to rob.

\*\*\*

[The State]: Okay, and this is, I guess, how often have you come across this, generally speaking, in your times investigating robberies?

[Det. Wimberly]: Numerous times[.]

Det. Wimberly's testimony defining the slang term "lick" is distinguishable from the testimony at issue in *Blackwell* and *Payne*. *Blackwell* emphasized the scientific nature of the HGN test, 408 Md. at 681, 971 A.2d at 298, and *Payne* focused on the breadth of technical data being tailored down and interpreted into a consumable format based on experience in the field, 440 Md. at 700–01, 104 A.3d at 154. Here, Det. Wimberly offered a nontechnical definition for a colloquial slang term. While we recognize that Det. Wimberly testified that his opinion was derived from his tenure with the robbery unit, and the questions from the Assistant State's Attorney referenced the officer's "training and experience,"[12] the nature of his opinion was not reliant on processes or methodology

---

[12] As explained, our decision turns on the nature of the opinion being offered and the discretion afforded circuit court judges who must consider whether to admit it. The manner in which the State introduced Det. Wimberly is not at issue. We acknowledge that the State, in introducing Det. Wimberly, attempted to have him opine regarding the definition of "lick," through the veneer of expertise. Maryland Rule 5-702 requires the circuit court consider whether an offered witness "is qualified as an expert by knowledge, skill, experience, training, or education, . . . the appropriateness of the expert testimony on the particular subject, and . . . whether a sufficient factual basis exists to support the expert

16

testimony." Prior to attempting to elicit the definition of "lick," the State participated in the following colloquy with Det. Wimberly,

[The State]: How long have you been with the Sheriff's office?

[Det. Wimberly]: For the last fifteen years, since 2005.

[The State]: Okay, and how long have you been with the Robbery Unit?

[Det. Wimberly]: For the last nine years.

The following exchange then occurred following the court overruling Petitioner's objection:

[The State]: So anyway, [Det.] Wimberly, over the course of your nine years in the robbery unit, have you had the occasion to come across the term, lick?

[Det. Wimberly]: Yes, I have.

[The State]: Okay, and what, through your training and experience as a law enforcement officer, again, as a robbery detective, does that term mean?

[Det. Wimberly]: A robbery.

[The State]: Okay, and what about in the context of sweet, or something like that?

[Det. Wimberly]: Yeah, [an] individual, they might refer to it as saying a lick, meaning an individual is an easy rob, easy to rob.

***

[The State]: Okay, and this is, I guess, how often have you come across this, generally speaking, in your times investigating robberies?

[Det. Wimberly]: Numerous times[.]

The record does not reveal an attempt by the State to connect anything specific about Det. Wimberly's training or experience, beyond the fact that he had heard the term while investigating robberies, to the relevant definition for "lick."

17

outside the "ken" of a layperson. In our view, much like *Johnson* and *Galicia*, the facts of this case present an opinion derived from processes that were discernible to the average person and fall under Maryland Rule 5-701.

We agree with the State that the reasoning in *King* is persuasive. *King* concerned testimony "to the meaning of certain 'street lingo'" used in the District of Columbia. 74 A.3d at 679. The terms at issue, "gleezy" and "bagged" were opined to mean a firearm and robbery. *Id.* at 680. In holding that expertise was not required to opine on the meanings of these words, the District of Columbia Court of Appeals reasoned that learning slang terms represented "the everyday process of language acquisition" and "knowledge acquired through basic reasoning processes . . . accessible to an average person." *Id.* at 683. Det. Wimberly's opinion on the definition of "lick," based on his encounters with that term on the street while working in the robbery unit, progressed through similarly "everyday process[es] of language acquisition . . . accessible to an average person." *Id.* In

---

Inversely, the record reveals that the State met the standard for a lay opinion. Maryland Rule 5-701 requires the circuit court consider whether an offered witness's opinion is "rationally based on the perception of the witness[,]" *i.e.*, if it is derived from their personal knowledge. *See also Robinson v. State*, 348 Md. 104, 118, 702 A.2d 741, 747–48 (1997) ("A trial court should, within the sound exercise of its discretion, admit lay opinion testimony if such testimony is derived from first-hand knowledge; is rationally connected to the underlying facts; is helpful to the trier of fact; and is not barred by any other rule of evidence." (citation omitted)) Det. Wimberly testified to having familiarity with the term "lick" during his tenure with the Robbery Unit. Thus, the circuit court had sufficient testimonial evidence to consider and rule on the admission of a lay opinion concerning the meaning of "lick." As we explain above, the circuit court concluded that Det. Wimberly did not need to be tendered as an expert witness to testify concerning the definition for "lick," and accepted Det. Wimberly's testimony as lay testimony. This choice was correct and, as we hold, not an abuse of discretion.

spite of the prosecutor's seemingly rote reference to "training and experience" in questioning, in context, it is apparent that Det. Wimberly's knowledge was derived from his everyday experience in hearing and using language, not from any specialized training, education, or experience.

Indeed, as the Appellate Court points out, "lick" has been defined by the crowdsourced Urban Dictionary, *Freeman*, 259 Md. App. at 233, 303 A.3d at 74, and, as the State points out, has been utilized in the public media. The question before us "is not whether the average person is already knowledgeable about a given subject, but whether it is within the range of perception and understanding."[13] *Galicia*, 479 Md. at 394, 278 A.3d

---

[13] The dissent argues that an average layperson would not know that "lick" could be defined as a robbery. *See* Dissenting Op. 5–10. As *Galicia* makes clear, this is not the appropriate test. *See Galicia*, 479 Md. at 394, 278 A.3d at 161. The average layperson need not have known that "lick" could mean a robbery. Rather, the focus should be on whether the term "lick" was within the "ken" of their understanding. The dissent also posits that "[t]he scarcity of mention of the words 'lick' and 'sweet lick' as referring to robberies in Maryland case law demonstrates that the purported slang meaning of the words is not widely used." Dissenting Op. 10. An average layperson has the capacity to understand new meanings for old words without intervention by the courts. Det. Wimberly's testimony regarding the definition of the slang term "lick" was within the "ken" of a layperson. Accordingly, when the circuit court allowed Det. Wimberly to testify, following its expressed belief that expert testimony was not required, it did not abuse its discretion.

at 161.  Specific to the facts of this case, defining the slang term "lick" was within the range of perception of a layperson.[14]  Accordingly, the circuit court did not abuse its discretion.[15]

## Conclusion

For the reasons expressed above, we affirm the judgment of the Appellate Court of Maryland, but on different grounds.  On review of a circuit court's admission of a witness's testimony, we consider whether the circuit court abused the considerable discretion afforded to it.  We hold that the circuit court did not abuse its discretion in allowing Det. Wimberly to opine as a lay witness.  The record reflects that the circuit court did not believe that Det. Wimberly needed to be tendered as an expert prior to his testimony.  The circuit court was correct, our precedent and the facts of this case demonstrate that Det. Wimberly's opinion regarding the definition of "lick" was not beyond the "ken" of a layperson and did not require qualification as an expert under Maryland Rule 5-702.

> **JUDGMENT OF THE APPELLATE COURT IS AFFIRMED.  COSTS TO BE PAID BY PETITIONER.**

---

[14] Consequently, discussion of Petitioner's proposed question concerning Maryland Rule 4-263(d)(8) is unnecessary.  Maryland Rule 4-263(d)(8) requires the State disclose to the defense certain information related "to each expert consulted by the State's Attorney in connection with the action[.]"  As Det. Wimberly did not testify in expert fashion, the State need not have complied with Maryland Rule 4-263(d)(8).

[15] We note that the State raised in its briefing a claim that Petitioner waived all other appealable grounds, including those before this Court, by virtue of objecting on the specific grounds he was not provided with adequate notice under *Ragland* or *Blackwell*.  Maryland Rule 8-131(b)(1) provides in relevant part, "the Supreme Court ordinarily will consider only an issue that has been raised in the petition for certiorari or any cross-petition and that has been preserved for review by the Supreme Court."  We conclude that Petitioner did not waive the claims raised in this appeal.

Circuit Court for Charles County
Case No. C-08-CR-20-000179

Argued: April 9, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 24

September Term, 2023

_____

DARRYL EDWARD FREEMAN

v.

STATE OF MARYLAND

_____

Fader, C.J.
Watts
*Hotten
Booth
Biran
Gould
Eaves,

JJ.

_____

Dissenting Opinion by Watts, J.

_____

Filed: July 16, 2024

*Hotten, J., now a Senior Justice, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to Maryland Constitution, Article IV, § 3A, she also participated in the decision and adoption of the majority opinion.

Respectfully, I dissent. I would hold that the Circuit Court for Charles County abused its discretion in allowing Detective Corey Wimberly, who was not accepted as an expert, to testify that the words "lick" and "sweet lick" refer to a robbery. From my perspective, it is improper for a witness to testify as a lay witness about the meaning of slang terms where the record shows that the witness learned the meaning of the terms solely by virtue of specialized knowledge, skill, experience, training, or education undergone or acquired as a result of the witness's profession. Accordingly, I would reverse the judgment of the Appellate Court of Maryland, which affirmed most of the convictions of Darryl Edward Freeman, Petitioner/Cross-Respondent. See Freeman v. State, 259 Md. App. 212, 220-21, 303 A.3d 62, 66-67 (2023).

In the case, the Majority reaches the curious outcome that the judgment of the Appellate Court should be affirmed because a witness who was offered at trial by the State as an expert and who testified over the defendant's objection, actually gave lay opinion testimony rather than expert testimony and that the State did not need to comply with the notice requirement for presenting expert testimony even though the State argued at trial that it was presenting expert opinion and that it had given the necessary notice to do so. See Maj. Op. at 19 n.14. This is an unusual outcome to say the least.

Read together, "'M[aryland] Rules 5-701 and 5-702 prohibit the admission as 'lay opinion' of testimony based upon specialized knowledge, skill, experience, training or education.'" State v. Blackwell, 408 Md. 677, 690, 971 A.2d 296, 303 (2009) (quoting Ragland v. State, 385 Md. 706, 725, 870 A.2d 609, 620 (2005)) (cleaned up). "[E]xpert testimony is required when the subject of the inference to be drawn by the jury is so

particularly related to some [] profession that it is beyond the ken of the average lay[person.]" Am. Radiology Servs., LLC v. Reiss, 470 Md. 555, 580, 236 A.3d 518, 532 (2020) (cleaned up).

The State's position in the circuit court and Detective Wimberly's testimony itself require the conclusion that his testimony concerning the meaning of the words "lick" and "sweet lick" was not lay opinion. Md. R. 5-701(1). In the circuit court, the State sought to introduce Detective Wimberly as an expert witness to provide expert opinion about the meaning of the words "lick" and "sweet lick." At trial, the prosecutor attempted to lay a foundation for Detective Wimberly's testimony as an expert by asking: "In the course of your training and experience in that particular unit"—i.e., the robbery unit—"have you come across the term, 'lick'?" After Detective Wimberly responded: "Yes[,]" the prosecutor asked: "Okay, and what is a lick, in your training and experience?" Mr. Freeman's counsel objected, and the circuit court initiated a bench conference. Mr. Freeman's counsel argued that the State had not offered Detective Wimberly as an expert in any field, and certainly not in the field of slang terms.

Mr. Freeman's counsel contended that expert testimony was required and that there was "no notice given[.]" In response, the prosecutor contended that Detective Wimberly was designated in an "expert disclosure" that the State provided to Mr. Freeman's counsel during discovery.[1] In other words, in the circuit court when attempting to have Detective Wimberly's testimony admitted, the State did not argue that the detective's opinion was

---

[1]The parties dispute whether the record reflects that the State did not, in fact, properly designate Detective Wimberly as an expert during discovery.

admissible as lay witness opinion. Rather, the prosecutor expressly argued that Detective Wimberly had "specialized training and experience, which obviously would include the specific experience that he has in regards to investigating robberies[,]" and that "lay individuals do not have" such specialized training and experience. The prosecutor asserted: "We have laid a foundation in regards to his specific training and experience in regards to investigating robberies[.]"

After the circuit court overruled Mr. Freeman's objection, the following exchange occurred:

> [PROSECUTOR]: So anyway, Detective Wimberly, over the course of your nine years in the robbery unit, have you had the occasion to come across the term, lick?
>
> DETECTIVE WIMBERL[]Y: Yes, I have.
>
> [PROSECUTOR]: Okay, and what, through your training and experience as a law enforcement officer, again, as a robbery detective, does that term mean?
>
> DETECTIVE WIMBERL[]Y: A robbery.
>
> [PROSECUTOR]: Okay, and what about in the context of sweet, or something like that?
>
> DETECTIVE WIMBERL[]Y: Yeah, an[] individual, they might refer to it as saying a lick, meaning an individual is an easy rob, easy to rob.
>
> * * *
>
> [PROSECUTOR]: Okay, and this is, I guess[—]how often have you come across this, generally speaking, in your times investigating robberies?
>
> DETECTIVE WIMBERL[]Y: Numerous times, yeah.[2]

---

[2]It is incorrect for the Majority to state: "The record does not reveal an attempt by the State to connect anything specific about Det. Wimberly's training or experience,

- 3 -

The State's position in the circuit court was that Detective Wimberly could testify that the words "lick" and "sweet lick" refer to a robbery because he was designated pretrial as an "expert" during discovery, and because he had "specialized training and expertise" that he had attained "over the course of [his] nine years in the robbery unit" that "lay individuals do not have."

When asked, Detective Wimberly confirmed that through his training and experience as a law enforcement officer, specifically as a robbery detective, he knew that the words "lick" and "sweet lick" meant robbery and that he had "come across" the words "lick" and "sweet lick" during his nine years in the robbery unit investigating robberies. Unlike in other cases in which police officers have been presented as lay witnesses and have given lay opinion, Detective Wimberly did not testify to anything remotely along the lines of that he learned the meaning of the terms from talking to people in the community or that the slang definitions are easily perceivable. Contrary to the State's contention on brief that Detective Wimberly's testimony was "premised on his own personal knowledge and life experiences" and that he encountered the term "lick" and "sweet lick" being used to refer to robberies "in ordinary conversation[,]" Detective Wimberly did not testify that

---

beyond the fact that he had heard the term while investigating robberies, to the relevant definition for 'lick.'" Maj. Op. at 17 n.12. In the colloquy above, Detective Wimberly is not asked whether he "heard" the term "lick" while investigating robberies nor does he testify that he "heard" the term while investigating robberies. The detective was specifically asked "through your training and experience as a law enforcement officer, again, as a robbery detective," what does the term "lick" mean, and he responded: "A robbery." The colloquy reveals that Detective Wimberly knew the definition of the word based on his training and experience, not based on merely having "heard" the word while investigating robberies.

- 4 -

he learned the meaning of the terms in those ways.

Like Detective Wimberly's testimony that he knew the meaning of the terms "lick" and "sweet lick" based on his training and experience as a detective in the robbery unit for nine years, his testimony about other potential meanings of the word "lick" demonstrates that expert testimony was required. On cross-examination, Detective Wimberly agreed with Mr. Freeman's counsel that the word "licks" could be "used for anything, in terms of anything easy, easy money, something like that[.]" Detective Wimberly also agreed with Mr. Freeman's counsel that "lick" could refer to "com[ing] upon anything good," albeit "not typically." Detective Wimberly's testimony as a whole indicates that based on his experience as a robbery detective, he believed the most common or definite slang meaning of the word "lick" is "robbery," as opposed to "easy money" or "com[ing] upon anything good[.]" Only an expert could have properly offered such an opinion.

Detective Wimberly's testimony that the words "lick" and "sweet lick" may refer to a robbery exceeded the average layperson's understanding of the terms. Although some members of the public might have reason to believe that the words "lick" and "sweet lick" could refer to a robbery, the purported slang definition of the terms is not readily discernible. Unlike a law enforcement officer, an average member of the public would have no reason to be familiar with the circumstance that the word lick might be used to refer to a robbery. The record unequivocally demonstrates that it was only through Detective Wimberly's training and lengthy experience as a robbery detective that he formed the opinion that the words "lick" and "sweet lick" could refer to a robbery.

The words "lick" and "sweet lick" are not among words that have entered the

national lexicon and that have a meaning associated with robbery; and, contrary to the Majority's conclusion, the slang meaning that Detective Wimberly attributed to the words would not be readily "discernible to the average person[.]" Maj. Op. at 18. By way of comparison, given the popularity and longevity of the television series "Hawaii Five-O" (which ran from 1968 to 1980) and its reboot "Hawaii Five-0" (which ran from 2010 to 2020), it is safe to say that the average member of the public knows that "Five-O" can refer to a law enforcement officer. See IMDb.com, Inc., Hawaii Five-O, https://www.imdb.com/title/tt0062568/ [https://perma.cc/MW3B-G7SC]; IMDb.com, Inc., Hawaii Five-0, https://www.imdb.com/title/tt1600194/ [https://perma.cc/NUY6-G79F]; State v. Stewart, 815 So. 2d 14, 15 (La. 2002) ("'5-O[]' [is] street slang for the police[.]"). Other slang terms frequently used in fiction include "case the joint" (*i.e.*, to survey a site before a robbery), "knock over a bank" (*i.e.*, to rob a bank), and "wheelman" (*i.e.*, a getaway driver). In addition, there are multiple deeply-rooted slang terms for the word murder, such as "hit," "whack," and "rub out." Although the words "lick" and "sweet lick" might have been used to refer to robberies in some media and are defined in an urban dictionary, unlike the terms discussed above, this usage is not so widespread that the average member of the public would likely be familiar with or able to discern the slang meanings. See Maj Op. at 19.

Tellingly, as to each of the above examples of a word having both an everyday meaning and a well-established slang meaning, the Merriam-Webster dictionary includes definitions that encompass both such meanings. The Merriam-Webster dictionary points out that "case" can mean "to inspect or study especially with intent to rob" (*e.g.*, "cased

the bank before the robbery"). *Case*, Merriam-Webster, https://www.merriam-webster.com/dictionary/case [https://perma.cc/S8EQ-BM86] (italics omitted). Merriam-Webster also recognizes that "knock over" can mean "rob" (*e.g.*, "knocking over a bank"). *Knock Over*, Merriam-Webster, https://www.merriamwebster.com/dictionary/knock%20over [https://perma.cc/CH5F-E9U7] (cleaned up). Additionally, one of the definitions of "wheelman" is "the driver of an automobile[.]" *Wheelman*, Merriam-Webster, https://www.merriam-webster.com/dictionary/wheelman [https://perma.cc/CU64-PFYG]. And, Merriam-Webster notes that a "hit" can be "a premeditated murder committed especially by a member of a crime syndicate" (*e.g.*, "a hit on a rival gang leader"), and that "whack" and "rub out" can mean "murder" or "kill" (*e.g.*, "somebody rubbed him out with a twenty-two"). *Hit*, Merriam-Webster, https://www.merriam-webster.com/dictionary/hit [https://perma.cc/YFF2-7R8U] (italics omitted); *Whack*, Merriam-Webster, https://www.merriam-webster.com/dictionary/whack [https://perma.cc/S4L5-7DVQ] (capitalization omitted); *Rub Out*, Merriam-Webster, https://www.merriam-webster.com/dictionary/rub%20out [https://perma.cc/LGW2-44AL] (cleaned up).

Merriam-Webster contains sixteen definitions of the word "lick"—seven as a verb and nine as a noun—and none of them have anything at all to do with robbery. See *Lick*, Merriam-Webster, https://www.merriam-webster.com/dictionary/lick [https://perma.cc/X8YS-5792]. This demonstrates that the words "lick" and "sweet lick" have not entered the national lexicon as slang terms that refer to a robbery. And, there is nothing about the words "lick" or "sweet lick" that in and of themselves would make the purported slang meaning of "robbery" "discernible to the average person" or knowledge able to be

"acquired through basic reasoning processes accessible to an average person." Maj. Op. at 18 (cleaned up). In short, the alleged slang meaning of the words is not discernible to the average layperson through basic reasoning processes. That an average layperson may have "the capacity to understand new meanings for old words without intervention by the courts[,]" Maj. Op at 19 n.13, does not mean that Detective Wimberly's testimony regarding the definition of the slang term "lick" was within "the ken of the average layman," *i.e.*, "within the range of perception and understanding" of the average layperson. State v. Galicia, 479 Md. 341, 389, 394, 278 A.3d 131, 159, 161, reconsideration denied (Aug. 10, 2022), cert. denied, ___ U.S. ___, 143 S. Ct. 491 (2022) (cleaned up).

The Majority states that, "as the Appellate Court points out, 'lick' has been defined by the crowdsourced Urban Dictionary, *Freeman*, 259 Md. App. at 233, 303 A.3d at 74, and, as the State points out, has been utilized in the public media." Maj. Op. at 19. But, the Appellate Court held that "'[t]he meaning attributed by [Det.] Wimberly may well have been foreign to members of the jury, and it is reasonable to conclude that this interpretation was based on his specialized knowledge, training and experience[]' thus requiring qualification of Det. Wimberly as an expert." Maj. Op. at 6 (quoting Freeman, 259 Md. App. at 235, 303 A.3d at 75) (alterations in original).

In its discussion, the Appellate Court actually quoted two websites—namely, Urban Dictionary and Cyber Definitions—that indicate that "lick" can refer to a robbery. See Freeman, 259 Md. App. at 233-35, 303 A.3d at 74-75. Neither Urban Dictionary nor Cyber Definitions is a reliable enough source to be used as a basis for determining that a word is accepted in the national lexicon. Authoritative dictionaries, such as Merriam-Webster,

- 8 -

employ "professional dictionary editors and writers" who create and update definitions. Merriam-Webster, About Us, https://www.merriam-webster.com/about-us [https://perma.cc/R85K-6RKW]. The Urban Dictionary is made up of definitions written by users of that website—all that is needed to get a definition added is to submit it and have it approved by moderators. See Urban Dictionary, Adding a new definition (updated July 1, 2023), https://help.urbandictionary.com/article/41-adding-a-definition [https://perma.cc/A2XN-XFF8]. As with Wikipedia, any person can have material added to Urban Dictionary. Cyber Definitions reveals little about the authors of the definitions on its website, which contains a form that any user can employ to express disagreement with that website's contents or to advise of a missing slang term. See Cyber Definitions, About Cyber Definitions, https://www.cyberdefinitions.com/admin/about_cyber_definitions.html [https://perma.cc/KM9V-B5A7]. Urban Dictionary and Cyber Definitions are not reliable sources for the proposition that that the average layperson would know the words "lick" and "sweet lick" refer to a robbery—let alone that for the proposition that the slang meaning of terms is so easily perceivable that a lay witness can give testimony that one purported meaning is more definitive than another.

Like Merriam-Webster, our case law is silent on the matter of "lick" and "sweet lick" referring to a robbery. To my knowledge, this Court has never mentioned the slang meaning of the words before. Outside of this case, the Appellate Court has done so in only one reported opinion. In Mungo v. State, 258 Md. App. 332, 348, 298 A.3d 905, 914-15, cert. denied, 486 Md. 158, 303 A.3d 969 (2023), the Appellate Court indicated that one of the State's witnesses testified that the defendant told him that "he was 'gonna hit a lick,'

- 9 -

meaning commit a robbery." As the Appellate Court acknowledged in its opinion in this case, "[t]he admissibility of the term "lick" was not at issue in" Mungo. Freeman, 259 Md. App. at 224 n.5, 303 A.3d at 69 n.5. The scarcity of mention of the words "lick" and "sweet lick" as referring to robberies in Maryland case law demonstrates that the purported slang meaning of the words is not widely used.

Our decisions in Ragland and Blackwell support the conclusion that expert testimony is required in this case. In Ragland, 385 Md. at 726, 870 A.2d at 620-21, we held that the trial court abused its discretion in allowing two lay witnesses, who were law enforcement officers, to opine that, among the numerous possible explanations for certain events, "the correct one was that a drug transaction had taken place." The officers testified that they saw a hand-to-hand transaction between a passenger in a parked vehicle and an individual who was known to the officers from a drug arrest and who had made two calls from payphones at gas stations—one before the vehicle parked on a street called Northwest Drive and one after. See id. at 709, 870 A.2d at 611.

We determined that it was clear that the officers' opinion that the transaction was a drug deal was based on their "specialized knowledge, experience, and training." Id. at 725, 870 A.2d at 620. We observed that both officers testified about their specialized training and experience with drug arrests and investigations. See id. at 725-26, 870 A.2d at 620. We explained that "[t]he connection between the officers' training and experience on the one hand, and their opinions on the other, was made explicit by the prosecutor's questioning[,]" which included the prosecutor asking one of the officers "whether 'based on [his] training and experience' the activity on Northwest Drive was 'of significance' to

him[.]" Id. at 725-26, 870 A.2d at 620-21 (third alteration in original).

In Blackwell, 408 Md. at 680-81, 971 A.2d at 297-98, we held that the trial court abused its discretion in allowing a lay opinion from a witness, who was a law enforcement officer, about the defendant's performance on a horizontal gaze nystagmus test.[3] We determined that the officer's testimony was not based on his "general knowledge as a layperson but upon his specialized knowledge and training[,]" given that the officer testified about matters that "a layperson would not necessarily know[.]" Id. at 691, 971 A.2d at 304 (citations omitted). We stated: "[T]o preserve the distinction between lay and expert testimony, we refuse to allow, as the State attempted here, in derogation of *Ragland*, the proffering of an expert witness in lay witness clothing." Blackwell, 408 Md. at 697, 971 A.2d at 307.

In both this case and Ragland, 385 Md. at 725-26, 870 A.2d at 620, officers testified about their extensive experience in law enforcement and that their testimony was being based on that experience. In both this case and Ragland, id. at 725-26, 870 A.2d at 620-21, the connection between the officers' opinions and their training and experience "was made explicit by the prosecutor's questioning[,]" which expressly sought opinions based on the officers' "training and experience[.]" Based on this line of questioning alone, it would not be possible to conclude that Detective Wimberly testified about matters that "a layperson would not necessarily know." Blackwell, 408 Md. at 691, 971 A.2d at 304.

---

[3]A horizontal gaze nystagmus test is a standardized field sobriety test used by law enforcement to determine whether a driver is impaired by alcohol. See Motor Vehicle Admin. v. Gonce, 446 Md. 100, 104 n.3, 130 A.3d 436, 439 n.3 (2016).

Our decisions in Johnson v. State, 457 Md. 513, 179 A.3d 984 (2018), and Galicia, 479 Md. 341, 278 A.3d 131, also support the conclusion that expert testimony as required in this case. As we explained in Johnson, 457 Md. at 530, 179 A.3d at 994, expert testimony is required when the subject of the testimony is "beyond the ken" of the average layperson; "it is not required on matters of which the jurors would be aware by virtue of common knowledge." (Cleaned up). In Johnson, id. at 521, 537, 179 A.3d at 988, 998, this Court held that the trial court did not abuse its discretion in allowing an officer of the Maryland Transit Administration Police Force ("the MTA Police Force") to testify as a lay witness about a report related to a Pocket Cop—i.e., a GPS-equipped cell phone provided to the defendant as an officer of the MTA Police Force. We explained that GPS technology is pervasive and that the technology is familiar to the general public. See id. at 531, 179 A.3d at 994. In Johnson, id. at 521, 179 A.3d at 988, the State had made no attempt to offer the witness as an expert and consistently contended that the officer's presentation of the report was lay testimony. The holding in the case turned on the determination that GPS technology is so reliable and well known that admission of the report at issue did not require expert testimony. See id. at 530-33, 179 A.3d at 994-95. And, in Johnson, the State never took a position otherwise.

In Galicia, 479 Md. at 395, 278 A.3d at 162, we held that a "witness who introduced records from Google concerning Mr. Galicia's two accounts need not have been qualified as an expert to testify that an account holder has the ability to turn off a location tracking function associated with those accounts." We pointed out that the witness was a Google records custodian, and that "[t]he State did not seek to qualify [the witness] as an expert

- 12 -

witness." Id. at 386, 278 A.3d at 157. We explained that the most significant issue was not whether the records were self-explanatory, but rather "[t]he more significant issue is whether [the witness] relied on specialized knowledge in explaining that a user has the ability to enable or disable the tracking of that data, thereby ascribing significance to that gap." Id. at 393, 278 A.3d at 161. We explained:

> Google's location history tracking is a consumer feature designed to be understood and managed by accountholders. When a court considers whether testimony is beyond the "ken" of the average layman, the question is not whether the average person is already knowledgeable about a given subject, but whether it is within the range of perception and understanding.

Id. at 394, 278 A.3d at 161. We concluded: "That a user's customized or default settings may impact the records kept by those entities does not require specialized knowledge to understand." Id. at 394, 278 A.3d at 161-62.

Our holdings in Johnson and Galicia firmly establish the point that where a witness renders an opinion based on specialized knowledge, training, or experience, the witness must be qualified as an expert to do so. In each case, we determined that witnesses who were called as lay witnesses and whom the State made no attempt to present as experts were in fact not relying on specialized knowledge to render the testimony given. Our holdings in Johnson and Galicia stand in stark contrast to the circumstances of this case in which the State purported to give notice of its intent to present expert testimony, attempted to have its witness qualified as an expert at trial, and the witness testified, over the

defendant's objection, that his opinions were based on his training and experience as a robbery detective.[4]

The District of Columbia Court of Appeal's holding in <u>King v. United States</u>, 74 A.3d 678 (D.C. 2013), is not applicable in this case. In <u>King</u>, <u>id.</u> at 682-83, the District of Columbia Court of Appeals held that the trial court did not abuse its discretion in allowing lay witnesses, who were law enforcement officers, to testify about the meaning of slang terms. The Court explained:

> Officer Sepeck testified that the term "gleezy" is a "street term for the gun named Glock," and that in the context of Holmes and Connor's conversations, which were played to the jury, "40" meant a .40 caliber semiautomatic gun. Detective Francis testified about the term "bagged" saying, "I've heard the kids talk about ... bagging somebody, robbing them, getting their stash, bagging their stash. Maybe that's it. Bagging means I got them. You know, it's like bragging about it." Officers Sepeck and Francis based their street lingo interpretations on their lengthy experience working on criminal investigations in southeast D.C. and speaking regularly about crime with young people in that community.

---

[4]As with <u>Johnson</u> and <u>Galicia</u>, the conclusion that expert testimony was required here is consistent with another case that the State relies on—namely, <u>In re Ondrel M.</u>, 173 Md. App. 223, 244, 918 A.2d 543, 555 (2007), in which the Appellate Court held that a law enforcement officer's testimony that he smelled marijuana was a proper lay opinion. As the Appellate Court observed, "an expert is not required to identify the odor of marijuana. No specialized knowledge or experience is required in order to be familiar with the smell of marijuana. A witness need only to have encountered the smoking of marijuana in daily life to be able to recognize the odor." <u>Id.</u> at 243, 918 A.2d at 554-55. Indeed, even before the possession of small amounts of marijuana was decriminalized and later legalized under Maryland law, the substance was abundant. Accordingly, it has not necessarily been uncommon for a civilian—whether a user of marijuana or not—to be able to recognize its distinct, pungent odor. In other words, although law enforcement officers are often trained and experienced in detecting the smell of marijuana, they are far from the only ones who can do so. By contrast, the circumstance that "lick" and "sweet lick" can refer to a robbery is so obscure that the average civilian would likely have no reason to know of it. Detective Wimberly knew the slang meaning of the words based on his "training and experience" and because he had spent years investigating robberies.

Id. at 680 (footnotes omitted).

The Court determined that the officers' "opinions were sufficiently grounded in perceptions gained through their personal experiences[,]" that "the reasoning process the officers employed to interpret the street language was the everyday process of language acquisition[,]" and that "[t]he officers did not use any special training or scientific or other specialized professional knowledge to form their opinions about the meaning of the language used by the individuals in" King. Id. at 682-83. The officers in King were not offered as expert witnesses. See id. at 680-81. And, in reaching its determination, the Court relied on the fact that the officers gained knowledge of the terms at issue by speaking regularly with young people in the community. See id. at 680, 682. There is no similarity between the State's attempt to qualify Detective Wimberley as an expert witness who knew the meaning of the words "lick" and "sweet lick" based on his training and experience as a robbery detective and the District of Columbia Court of Appeals's conclusion in King that officers, offered as lay witnesses, gained knowledge of slang terms from their experience in speaking regularly with young people in the community.[5]

---

[5]In my view, another layer of concern in applying the holding in King is that the District of Columbia Court of Appeals upheld the admission of lay testimony about slang terms largely on the ground that such testimony was based on the officers' "personal experiences." King, 74 A.3d at 683. Without greater explanation, that is not a particularly useful way to distinguish lay opinions from expert opinions, given that it could be said that all of a person's opinions, expert or lay, are based on "personal experiences" and that all of a person's experiences are "personal experiences." For example, a lay witness's opinion that another person seemed angry is based on the lay witness's personal experiences with angry people. And, an expert's opinion that a given property was a cause of a plaintiff's exposure to lead could be said to be based on the expert's personal experiences in assessing lead-related data.

Although testimony about the meaning of slang terms will not always require expert opinion, it does where, as in this case, the meaning of the terms is beyond the ken of the average layperson and the witness's opinion as to the meaning of the terms is based on the witness's training and experience in a particular field.

For the above reasons, respectfully, I dissent.